UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| DONALD W. RICHTER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-1623-RLY-TAB |
| | ) | |
| CORPORATE FINANCE ASSOCIATES, | ) | |
| LLC, | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Donald Richter ("Plaintiff"), brought the present suit alleging that

Defendant, Corporate Finance Associates, LLC ("CFA" or "Defendant"), breached the

parties' agreements by failing to pay commission and salary due him.  Plaintiff seeks

damages for the monies allegedly owed him under the agreements as well as penalties

pursuant to Indiana's Wage Payment Statute.  Defendant counterclaimed alleging that

under the relevant agreements, Defendant overpaid Plaintiff and is entitled to

reimbursement.  Defendant now moves for summary judgment on Plaintiff's breach of

contract claims.  Plaintiff cross moves for summary judgment on his claims and on

Defendant's counterclaim.  For the reasons set forth below, the court **GRANTS** in part

and **DENIES** in part Defendant's motion and **DENIES** Plaintiff's motion in its entirety.

1

**I.      Statement of Facts**

**A.      Background**

1.      Plaintiff owned a consulting business named Corporate Finance Associates-OKI ("CFA-OKI" or "OKI"), which represented buyers or sellers in merger and acquisition transactions.  (Deposition of Donald Richter ("Richter Dep.") at 8, 10, Defendant's Ex. A).

2.      OKI was part of a national network of offices called Corporate Finance Associates Worldwide ("CFAW").  (Richter Dep. at 18).  Plaintiff owned 100% of OKI, and OKI owned a portion of CFAW.  (Richter Dep. at 18–19).

3.      Plaintiff decided to sell OKI to Defendant due to his (Plaintiff's) age and the fact that he received a fair offer from Charles Spillman ("Spillman"), Defendant's owner.  (Richter Dep. at 13–14; Deposition of Charles Spillman ("Spillman Dep.") at 17–18, Plaintiff's Ex. 8).

4.      OKI and Plaintiff, as its sole shareholder, entered into an Asset Purchase Agreement with Defendant on March 3, 2001.  (Asset Purchase Agreement, Plaintiff's Ex. 2).  Pursuant to its terms, however, the Asset Purchase Agreement did not become effective until CFAW consented to the sale, which occurred on April 16, 2001.  (Asset Purchase Agreement at Section 1.1; Richter Dep. at 47).

5.      Plaintiff's employment began when the sale of OKI to Defendant became effective on April 16, 2001.  (Richter Dep. at 46).

**B.      The Agreements**

6.      The Asset Purchase Agreement states in relevant part:

> Section 1.2.  Purchase and Sale.  At the closing, the Seller shall sell and the
> Buyer shall purchase the following assets: all tangible and intangible assets
> of CFA OKI, Inc., except those assets listed on Exhibit C, including without
> implied limitation all current acquisition, merger or divestiture transactions
> that Seller has pending or listed.  In exchange, Buyer will pay seller $6,250
> payable at closing. . . . Also seller's tangible and intangible assets include
> Seller's existing contracts, leads, anticipated deals or listings and pending
> sales . . . .

(Asset Purchase Agreement at 2–3).

7.      Along with the Asset Purchase Agreement, Defendant entered into an Employment

Agreement with Plaintiff on March 3, 2001.  (Employment Agreement, Plaintiff's

Ex. 3).

8.      The Employment Agreement states in pertinent part:

> 2.  This Agreement shall become effective simultaneous with the execution
> of the Asset Purchase Agreement and shall continue until terminated as
> provided herein under.

> 3.  For all services performed by the Employee under this Agreement,
> Employer agrees to compensate Employee as follows:

> a.  The Employee shall receive a yearly salary of $68,750 payable monthly,
> less all applicable withholding taxes, for the first year of employment.
> Thereafter, the Employee's salary shall be $70,000 during 2nd year reduced
> by $5,000.00 during each of the next six years of employment.  In all, the
> Employee shall receive during his eight years of employment, the total sum
> of $453,750 less all applicable withholding taxes.  These payments shall be
> paid to the Employee's wife or other descendants for services to be
> rendered in the event that he should become deceased or disabled within the
> eight-year term of this Employment Agreement.

> b.  All compensation and disbursements of any kind paid to employee shall

3

not be refundable. . . .

6.  Employee shall be paid a commission equal to the fees as described on Exhibit A[1] attached hereto for future services rendered by the Employee. All current acquisition, merger, or divestiture transactions that CFA OKI, Inc. has pending or listed are assets that Employer has purchased from CFA OKI, Inc. and Employee is entitled to no compensation for those transactions unless he provides future services that enable those transactions to close in which case he will be entitled to the fees noted above.

7.  For so long as the Employee is employed, Employee shall receive up to $500.00 per month to defray the lease of an automobile.

8.  In the event that the annual cumulative commissions due and payable to the Employee exceed the annual cumulative salary, automobile expense and office expense, noted in Paragraphs 3 and 7 above that have been paid by the Employer, the Employer shall pay the difference to the Employee on or before 30 days after the annual anniversary date of this agreement.  Not withstanding, the Employer will reimburse the Employee for attending the CFA meeting in Cancun, Mexico in March 2001, providing that the Employee is employed by the Employer at that time.

(Employment Agreement at 1, 2).

9.      On April 2, 2001, the parties executed an Addendum Agreement to their

Employment Agreement.  (Addendum Agreement, Plaintiff's Ex. 4).  It states in

relevant part:

1.  Inconsistencies.  To the extent that there are any inconsistences between the Employment Agreement and this Addendum Agreement, the terms and provisions of this Addendum Agreement shall control.

2.  Commissions.  Employee agrees that he shall earn commissions for the Employer without regard to Section 6 and 8 in the amount of at least one hundred and fifty thousand dollars ($150,000) ("Commission Quota")

---

[1] Exhibit A is a fee schedule, which, in summary, provides that Employee (Plaintiff) gets 60% of the fees collected by Defendant's office, whether Employee represents the seller, the buyer, or both.  (Employment Agreement Exhibit A, Plaintiff's Ex. 3).

during the course of his employment.  The $150,000 in commissions shall be measured by referring to the net commissions retained by the Employer pursuant to Exhibit A without regard to Section 6 and 8 to the Employment Agreement by and between the Employer and the Employee.  Specifically, net commissions retained by Employer is defined as: Fees earned from Transactions by Employee on behalf of Employer, after deducting those portions of such fees payable to other CFA or outside intermediary offices or to Associates of Employer, and Commissions paid to Employee.  If at any time during the duration of the Employment Agreement, the amount of unearned Commission Quota exceeds the amount of salary to be paid to Employee pursuant to paragraph 3(a) of the Employment Agreement, the salary payments to be paid under said paragraph 3(a) shall cease until such time as the remaining salary to be paid shall be less than or equal to the unearned Commission Quota.  Any salary payments missed as a result of failing to have reached the $150,000 Commission Quota will be made up once the $150,000 Commission Quota shall be attained.  Attached Exhibits B1 and B2 provide specific examples.

(Addendum Agreement at 1–2).

10.     Below is a selection of the examples provided in Exhibits B1 and B2 to the

Addendum Agreement.  These demonstrate the relationship between fees earned

by Employee on behalf of Employer, the commission earned by Plaintiff, the

commission actually paid to Plaintiff, and what amount of any fees Plaintiff earns

on behalf of Defendant is applied to his Commission Quota.

5

11.

| Year 1 | Example A | Example B | Example C | Example D |
|---|---|---|---|---|
| Fees to CFA LLC- Ind.[2] | 80,000 | 200,000 | 0 | 300,000 |
| 60% of Fees[3] | 48,000 | 120,000 | 0 | 180,000 |
| Salary, auto & office expense | 80,000 | 80,000 | 80,000 | 80,000 |
| Commission Payable[4] | 0 | 40,000 | 0 | 100,000 |
| Commission Retained by CFA-LLC[5] | 80,000 | 160,000 | 0 | 200,000 |
| Commission applied towards quota[6] | 32,000 | 80,000 | 0 | 120,000 |

(Addendum Agreement Ex. B1).

12.    The Asset Purchase Agreement, the Employment Agreement, and the Addendum

Agreement together accomplished the sale of OKI to Defendant.  (Richter Dep. at

40).

---

[2] Exhibit B2 defines this term as "all fees earned by Employee on behalf of Employer, after deducting those portions of such fees payable to other CFA or outside intermediary offices or to other Associates of Employer.  (Addendum Agreement Ex. B2).

[3] Exhibit B2 defines this term as "the commissions that would be payable to Employee without regard to Section 6 and 8.  (Addendum Agreement Ex. B2).

[4] Exhibit B2 defines this term as "the amount payable to Employee after deducting the salary, auto expense and office expenses for the year (See Sections 6 and 8).  (Addendum Agreement Ex. B2).

[5] Exhibit B2 defines this term as "the Fees to CFA LLC-Indiana less the Commission Payable to Employee."  (Addendum Agreement Ex. B2).

[6] Exhibit B2 defines this term as "40% of 'Fees to CFA LLC-Indiana' without regard to Section 6 and 8."  (Addendum Agreement Ex. B2).

### C.    The Deerfield Transaction

13.    In conjunction with the Employment Agreement, Plaintiff provided a schedule of

projects for which Plaintiff proposed to provide services.  (Affidavit of Donald

Richter ("Richter Aff.") at ¶ 20, Ex. A to Plaintiff's Surreply/Reply Brief).[7]

14.    Deerfield Manufacturing Company ("Deerfield") was a prospective client

identified on that schedule but was not yet under contract with OKI.  (Richter Aff.

at ¶ 20).

15.    In April 2001, the President of Deerfield, Brad Norris ("Norris"), contacted

Plaintiff, with whom he had been in periodic contact since December 1999, to tell

Plaintiff that he was considering selling Deerfield.  (Deerfield Background Facts

Memo ("Deerfield Memo") at ¶¶ 2, 3, Defendant's Ex. G).

16.    On May 7, 2001, Deerfield entered into a "sell side" fee agreement with

Defendant, whereby Defendant was to seek a buyer for Deerfield and Deerfield

was to pay Defendant a fee if a sale occurred.  (Richter Aff. at ¶ 27).

17.    Pursuant to this agreement, Plaintiff prepared a target list of potential buyers and a

---

[7] Plaintiff's affidavit was originally filed in this case as Exhibit 1 to his Response Brief. However, Defendant objected to it because it was signed electronically and did not recite that his statements were true and correct.  In response to Defendant's objections, Plaintiff re-filed his affidavit as Ex. A to his Surreply/Reply Brief.  His second affidavit contained his actual signature and a recitation that the facts were true and correct.  However, it also is missing page 7 and contains 5 new paragraphs numbered 43-48, which Defendant argues are legal conclusions and should be stricken.  The contents are otherwise unaltered.  The court will read the two affidavits together in order to give meaning to the second affidavit's missing page 7.  Although the court finds that paragraphs 43–48 are based upon Plaintiff's personal knowledge and would be admissible, the court does not cite them in its statement of facts as that evidence is immaterial to the court's decision on the present motions.

report containing material information about Deerfield to be sent to the potential buyers. (Richter Aff. at ¶¶ 2–3).

18.   Acklin Stamping Co. ("Acklin"), the company that ultimately bought Deerfield, was part of Plaintiff's target list. (Richter Aff. at ¶ 29). Acklin was one of Deerfield's major competitors. (Deerfield Memo at ¶ 6).

19.   Plaintiff prepared a packet of information about Deerfield and sent the mailings to over one hundred companies. (Deerfield Memo at ¶ 7). From these, Plaintiff received about 30 inquiries. (Deerfield Memo at ¶ 7).

20.   Plaintiff did not send this information to Acklin pursuant to Deerfield's request. (Deerfield Memo at ¶ 6).

21.   One company was especially interested in Deerfield, and Plaintiff thought it necessary to contact Deerfield's primary customer, Copeland, to ensure that the interested buyer was acceptable to Copeland and that Copeland would continue to do business with Deerfield once ownership changed. (Deerfield Memo at ¶ 8).

22.   Copeland insisted that it would not do business with the interested company; rather, it would only do business with one of two potential buyers, one of which was Acklin. (Deerfield Memo at ¶ 9). Copeland then called Acklin and the other buyer on its own to suggest those companies call Deerfield to attempt a purchase. (Deerfield Memo at ¶ 9).

23.   The other buyer was not interested, but Acklin was very interested and contacted Deerfield promptly. (Deerfield Memo at ¶ 9).

24.    Plaintiff provided a confidentiality agreement to Acklin, and upon its return, he

provided Acklin with the report Plaintiff had prepared on Deerfield.  (Richter Aff.

at ¶ 29f).

25.    Norris (Deerfield's President) met with the President of Acklin, Howard Ice

("Ice"), regarding the sale.  (Richter Aff. at ¶ 29h).  The two men developed a

positive interpersonal relationship and, as a result, advised Plaintiff that they

would deal with each other directly as the transaction progressed.  (Richter Aff. at

¶ 29i).

26.    During the negotiations, Norris contacted Plaintiff regarding some of the deal

terms.  (Richter Aff. at ¶ 29j).

27.    Deerfield closed its asset sale to Acklin on January 31, 2002.  (Richter Aff. at ¶

29k).  Upon its closing, Plaintiff sent an invoice to Deerfield on behalf of

Defendant for Defendant's fees.  (Richter Aff. at ¶ 29l).  Deerfield then gave the

check to Plaintiff who delivered it to Defendant's general manager.  (Richter Aff.

at ¶¶ 31–32).

28.    The total fee Defendant collected for the Deerfield transaction was $326,769.84.

(2002 Year End Calculations, Defendant's Ex. J).


**D.      Plaintiff's Unpaid Bonus and Salary**

29.    In May 2002, Plaintiff sent a letter to Defendant entitled "Year end Calculations,"

which reflected the bonus to which Plaintiff believed he was entitled for the

Deerfield transaction.  (2002 Year End Calculations).

30.   Plaintiff's calculations reflect that during his first year of employment (April 2001–April 2002), Plaintiff collected a total of $340,795.04 in fees for Defendant. (2002 Year End Calculations Ex. A).

31.   All but about $2025.00 of these fees were from the Deerfield transaction.  (2002 Year End Calculations Ex. A; Richter Dep. at 67).

32.   From this total amount of fees, Plaintiff calculated his gross commission as $204,477, which constituted 60% of the total fees collected by Plaintiff on behalf of Defendant.  (2002 Year End Calculations Ex. A).

33.   After subtracting all of his expenses paid by Defendant, including his salary, Plaintiff calculated his net commission payable as $124,427.85.  (2002 Year End Calculations).

34.   Defendant never paid Plaintiff this commission.  (Richter Aff. at ¶ 36).

35.   In February 2006, Defendant stopped paying Plaintiff's salary.  (Plaintiff's Response to Interrogatory 11, Defendant's Ex. K; Complaint ¶¶ 25–26).

36.   Up until that point, Defendant had paid Plaintiff a total of $309,580 in salary (along with a $487.88 reimbursement for Plaintiff's January 2002 car lease payment, to equal a total amount of payments of $310,067.88).  (Plaintiff's Response to Interrogatory 11).

37.   Plaintiff had to pay his May 2006 car lease payment in the amount of $530 because Defendant did not pay it.  (Richter Aff. at ¶ 39; Complaint ¶ 40).

10

38.    From February 2006 through March 2007, Plaintiff's unpaid salary totaled $59,586.  (Richter Aff. at ¶ 41).

39.    For the years 2001 through 2006, Defendant prepared a U.S. Treasury Department Form W-2 reflecting Plaintiff's salary and car lease payments.  (Richter Aff. at ¶ 35).

## II.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When a summary judgment motion is made and supported by evidence as provided in Rule 56(c), however, the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).

A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Some alleged factual dispute that does not rise to a genuine issue of material fact will not alone defeat a summary judgment motion.  *Id*. at 247–48.  In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party.  *Miranda v. Wis.*

11

*Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

Where, as here, cross-motions for summary judgment are pending, the court evaluates each movant's motion under the Rule 56 standards cited above, "constru[ing] all inferences in favor of the party against whom [each] motion under consideration is made." *Metro. Life Ins. Co. v Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## III.   Discussion

### A.      Breach of Contract

Defendant and Plaintiff both move for summary judgment on the merits of Plaintiff's breach of contract claims as they relate to Plaintiff's unpaid commission and salary.

The interpretation and construction of a contract is a question of law for the court. *Eckart v. Davis*, 631 N.E.2d 494, 497 (Ind. Ct. App. 1994). Typically, the court must determine the intentions of the contracting parties from the four corners of the document. *Boswell Grain & Elevator, Inc. v. Kentland Elevator & Supply*, 593 N.E.2d 1224, 1227 (Ind. Ct. App. 1992). Contract terms are given their plain and ordinary meaning. *Bethlehem Steel Corp. v. Consol. Rail Corp.*, 740 N.E.2d 900, 905–06 (Ind. Ct. App. 2000). Where the contract terms are clear and unambiguous, the terms are conclusive and the court will not consider extrinsic evidence or otherwise construe the contract. *Id*. at 906. However, where a contract is ambiguous and its interpretation requires extrinsic evidence, the ambiguity must be resolved by the trier of fact. *Noblesville Redev. Comm'n*

12

*v. Noblesville Assocs. Ltd. P'ship*, 674 N.E.2d 558, 562 (Ind. 1996). The court's power to interpret contracts does not extend to changing their terms. *Gregg v. Cooper*, 812 N.E.2d 210, 215 (Ind. Ct. App. 2004). "[W]ritings executed at the same time and relating to the same transaction or subject matter will be construed together in determining the intent underlying the contracts." *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1138 (Ind. Ct. App. 2002).

### 1.   Unpaid Commission

Defendant and Plaintiff both move for summary judgment on Plaintiff's claim that he was entitled to a commission from the Deerfield transaction and that Defendant's failure to pay that commission breached Plaintiff's Employment Agreement. The disputed provision in the Employment Agreement reads:

> 6.  Employee shall be paid a commission equal to the fees as described on Exhibit A attached hereto for future services rendered by the Employee. All current acquisition, merger or divestiture transactions that CFA OKI, Inc. has pending or listed are assets that Employer has purchased from CFA OKI, Inc. and Employee is entitled to no compensation for those transactions unless he provides future services that enable those transactions to close in which case he will be entitled to the fees noted above.

(Employment Agreement at ¶ 6).

Defendant argues that the Deerfield transaction was a "current acquisition, merger or divestiture transaction" that Defendant purchased from OKI but that Plaintiff did not perform any future services that enabled the transaction to close. Thus, Plaintiff is not entitled to a commission. Plaintiff, on the other hand, argues that the Deerfield transaction was not such a transaction when the Employment Agreement was signed or

13

when it became effective, and thus he does not have to show he provided future services

enabling it to close to get his commission.  Even if Deerfield were such a transaction,

Plaintiff's contributions enabled it to close.  Thus, he is entitled to a commission.

The first issue the court must determine then is whether the Deerfield transaction

was a "current acquisition, merger or divestiture transaction" that OKI had pending or

listed.  The Employment Agreement does not define what qualifies as a current

acquisition, merger or divestiture transaction.  Further, the Employment Agreement does

not list any pending transactions that would enable the court to determine if the Deerfield

transaction was actually listed or if it fell into the relevant category of transactions.

The court next turns to the Asset Purchase Agreement for clarification on the

parties' intended meaning of a current acquisition, merger or divestiture transaction, as

the Asset Purchase Agreement and Employment Agreement were executed on the same

day and may be construed together.  The Asset Purchase Agreement states in part:

> Section 1.2.  Purchase and Sale.  At the closing, the Seller shall sell and the
> Buyer shall purchase the following assets: all tangible and intangible assets
> of CFA OKI, Inc., except those listed on Exhibit C, including without
> implied limitation all current acquisition, merger or divestiture transactions
> that Seller has pending or listed. . . .  Also, seller's tangible and intangible
> assets include Seller's existing contracts, leads, anticipated deals or listings
> and pending sales, in the business defined in Recital No. 1 and use of CFA
> OKI and CFAW trade names and marks, except that Seller may use the
> CFA OKI, Inc. name during the wind up period of CFA OKI, Inc."

(Asset Purchase Agreement at 2–3).  While Exhibit C to the Asset Purchase Agreement is

not in evidence, the parties do not argue that the Deerfield transaction was an excluded

asset.  The dispute is only whether the Deerfield transaction, as an asset that Defendant

purchased from OKI and Plaintiff, constitutes a "current acquisition, merger or divestiture transaction" or some other type of asset. However, the Asset Purchase Agreement does not define the disputed language in any more certain terms than the Employment Agreement. While the Asset Purchase Agreement references "existing contracts, leads, anticipated deals or listings and pending sales," it is not clear whether those types of assets are intended to be separate and distinct from current acquisition, merger or divestiture transactions. Further, neither the Asset Purchase Agreement nor the Employment Agreement make any mention of Deerfield. Without turning to extrinsic evidence, the court cannot determine whether the parties considered Deerfield a current acquisition, merger or divestiture transaction. This ambiguity must be resolved by the trier of fact.

Further, even if the Deerfield transaction was unambiguously a "current acquisition, merger or divestiture transaction," the court would be left to interpret the meaning of "enable" in Paragraph 6 of the Employment Agreement to determine if Plaintiff qualified for his commission. The term "enable" is equally ambiguous. Neither the Employment Agreement nor the Asset Purchase Agreement specifies what acts constitute "future services that enable those transactions to close." The undisputed evidence indicates that Plaintiff provided some guidance to Brad Norris of Deerfield during his negotiations with Howard Ice of Acklin and that Plaintiff invoiced Deerfield and collected Defendant's fee from Deerfield. Defendant argues that enabling a transaction to close means more than collecting a fee. However, Defendant cites no

15

definition in the Agreements to lend support to its position.  While Plaintiff may not have had as much involvement in the Deerfield transaction because the buyer and seller decided to deal directly with each other, that fact does not conclusively mean that Plaintiff's small contributions did not enable the transaction to close.  Without turning to extrinsic evidence, the court cannot say as a matter of law (assuming *arguendo* that the Deerfield transaction was a current acquisition, merger or divestiture transaction) that Plaintiff did or did not *enable* the Deerfield transaction to close as that term was contemplated by the parties.  This ambiguity must be resolved by the fact-finder.  The parties' cross-motions for summary judgment are therefore **DENIED** on Plaintiff's breach of contract claim for unpaid commission.

### 2.     Unpaid Salary

The parties also move for summary judgment on Plaintiff's claim that Defendant's failure to pay his salary breached the Employment Agreement and the Addendum Agreement.  Defendant argues that it was permissible to stop paying Plaintiff's salary because Plaintiff's unearned Commission Quota exceeded his unpaid salary.  Plaintiff responds that he met his Commission Quota, and thus Defendant was required to continue paying his salary under the relevant agreements.

The provision of the Addendum Agreement related to when Defendant may cease Plaintiff's salary payments reads as follows:

If at any time during the duration of the Employment Agreement, the

amount of unearned Commission Quota exceeds the amount of salary to be paid to Employee pursuant to paragraph 3(a) of the Employment Agreement, the salary payments to be paid under said paragraph 3(a) shall cease until such time as the remaining salary to be paid shall be less than or equal to the unearned Commission Quota. Any salary payments missed as a result of failing to have reached the $150,000 Commission Quota will be made up once the $150,000 Commission Quota shall be attained.

(Addendum Agreement at 2).[8] A closer look at this paragraph reveals a serious ambiguity in the language. The first part of the paragraph states that salary payments cease when the unearned Commission Quota is greater than the remaining salary to be paid under the Employment Agreement. However, the second part of this provision indicates that the salary payments will start again when the remaining salary to be paid is less than or equal to the unearned Commission Quota, or said another way, when the unearned Commission Quota is greater than or equal to the remaining salary to be paid. Read together, the salary payments cease when the remaining salary to be paid is less than the unearned Commission Quota but the salary payments start again when the salary payments to be paid is less than or equal to the unearned Commission Quota. The threshold question for when the salary payments cease and start again is the same. The only way to resolve this ambiguity is by turning to extrinsic evidence to determine the parties' intent in drafting this language. Such an ambiguity must be resolved by the trier of fact. Due to this

---

[8] Plaintiff argues, for the first time, in his Reply/Sur-Reply Brief that the Addendum Agreement was not supported by consideration; thus, implying it is not a valid contract. This argument constitutes one sentence of Plaintiff's Reply/Sur-Reply brief without citation to any legal authority. The court finds that Plaintiff has waived this argument. *See United States v. Jones*, 224 F.3d 621, 626 (7th Cir. 2000) ("Arguments that are not adequately developed or supported are waived.")

ambiguity, the court need not resolve at this stage the amount of Plaintiff's unearned Commission Quota, which is disputed by the parties.  The parties' cross-motions for summary judgment are therefore **DENIED** on Plaintiff's breach of contract claim for unpaid salary.

### C.      Indiana Wage Payment Statute

In addition to traditional breach of contract damages, Plaintiff seeks liquidated damages for Defendant's failure to pay his commission and salary under Indiana's Wage Payment Statute, Indiana Code § 22-2-5-2.  Defendant argues, first, that the relevant statute of limitations bars Plaintiff's Wage Payment Statute claim with respect to the unpaid commission and, second, that Plaintiff's salary under the Employment Agreement does not constitute a "wage" under the Wage Payment Statute.  The court addresses these arguments in turn below.

### 1.      Statute's Applicability to Unpaid Commission

The Wage Payment Statute does not contain a specific statute of limitations, and the parties dispute which limitations period the court should adopt.  Defendant argues that the applicable statute of limitations is the two-year limitation for penalties under Indiana Code § 34-11-2-4(3) because the liquidated damages Plaintiff seeks are penalties. Plaintiff argues, relying on *International Union v. Hoosier Cardinal Corp.*, 346 F.2d 242 (7th Cir. 1965), that a six-year statute of limitations applies.

The provision of the Wage Payment Statute under which Plaintiff seeks liquidated damages states:

> Every such . . . corporation . . . who shall fail to make payment of wages to
> any such employee as provided in section 1 of this chapter shall, as
> liquidated damages, for such failure, pay to such employee for each day that
> the amount due to him remains unpaid ten percent (10%) of the amount due
> to him in addition thereto . . . .

IND. CODE § 22-2-5-2.

"The applicable statute of limitations is determined by identifying the nature or substance of the cause of action." *Beineke v. Chem. Waste Mgmt. of Ind., LLC*, 868 N.E.2d 534, 538 (Ind. Ct. App. 2007) (quoting *Crossroads Serv. Ctr., Inc. v. Coley*, 842 N.E.2d 822, 824 (Ind. Ct. App. 2005)).  Damages are characterized as penal when they are disproportionate to the loss actually suffered.  *Browning v. Walters*, 616 N.E.2d 1040, 1045 (Ind. Ct. App. 1993).  The Wage Payment Statute is a penal statute.  *E & L Rental Equip., Inc. v. Bresland*, 782 N.E.2d 1068, 1070 (Ind. Ct. App. 2003).

Plaintiff seeks liquidated damages as allowed by the Wage Payment Statute in addition to traditional breach of contract damages.  The liquidated damages allowed under the statute are above and beyond Plaintiff's unpaid wages and, thus, disproportionate to the loss actually suffered.  Therefore, the liquidated damages are penalties even though the text of the statute may not use the word "penalty."  The two-year statute of limitations governing "a forfeiture of penalty given by statute" applies.  *See* IND. CODE § 34-11-2-4(3).

The case on which Plaintiff relies is inapplicable here.[9]  In *International Union*, the

---

[9] Plaintiff cites the Seventh Circuit opinion in *International Union v. Hoosier Cardinal Corp.*, 346 F.2d 242 (7th Cir. 1965).  However, the reasoning in that opinion was effectively overruled by the Supreme Court in *International Union v. Hoosier Cardinal Corp.*, 383 U.S. 696

Supreme Court held that under the Labor Management Relations Act, the appropriate state statute of limitations applies. *Int'l Union v. Hoosier Cardinal Corp.*, 383 U.S. 696, 704–05 (1966). Because the suit in that case was not merely one based on written contract, the six-year statute of limitations for oral contracts applied, rather than the twenty-year statute of limitations for written contracts. *Id.* at 705–07. *International Union* did not discuss the present Wage Payment Statute, *see Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 502 (7th Cir. 1996)*, nor did it consider whether the statute of limitations for statutory penalties applies.

For the reasons discussed above, the two-year statute of limitations for statutory penalties applies to Plaintiff's claim for unpaid commission under the Wage Payment Statute. Plaintiff was allegedly due and requested that commission in May 2002. This suit was filed on November 8, 2006, more than four years after the alleged violation and injury. Thus, Plaintiff's claim for penalties with respect to his unpaid commission is barred by the statute of limitations.

### 2.    Statute's Applicability to Unpaid Salary

The parties also dispute whether Plaintiff's unpaid salary constitutes a "wage" under the terms of the Wage Payment Statute. Under the Statute, wages are defined as "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method of calculating such amount. IND. CODE § 22-2-9-1(b). "Implicit in all the definitions [of

---

(1966). Thus, the court cites to the Supreme Court decision.

"wage"] is the concept that the payments are earned for services rendered." *Design*

*Indus., Inc. v. Cassano*, 776 N.E.2d 398, 402 (Ind. Ct. App. 2002).  To constitute "wages"

under the Statute, the pay must be based on an employee's own time, effort, or product.

*Manzon v. Stant Corp.*, 138 F. Supp. 2d 1110, 1113 (S.D. Ind. 2001).

      To discern whether Plaintiff's salary payments under the Employment Agreement

constitute wages, the court must also look to the contract itself to determine the parties'

intent with respect to these payments.  The relevant provision of the Employment

Agreement states:

> 3.  For all services performed by the Employee under this Agreement,
> Employer agrees to compensate Employee as follows:
>
> a.  The Employee shall receive a yearly salary of $68,750 payable monthly,
> less all applicable withholding taxes, for the first year of employment.
> Thereafter, the Employee's salary shall be $70,000 during 2nd year reduced
> by $5,000.00 during each of the next six years of employment.  In all, the
> Employee shall receive during his eight years of employment, the total sum
> of $453,750 less all applicable withholding taxes.  These payments shall be
> paid to the Employee's wife or other descendants for services to be
> rendered in the event that he should become deceased or disabled within the
> eight-year term of this Employment Agreement.

(Employment Agreement at ¶ 3a).

      At first glance, Plaintiff's salary as set forth in this provision seems to satisfy the

definition of "wage"—the language states specifically that the salary is for "all services

performed."  However, the last sentence of this paragraph indicates that Plaintiff's salary

is not a wage falling under the purview of the Wage Payment Statute.  The last sentence

states that in the case of Plaintiff's death or disability, which would render him unable to

work, his wife or other descendants will receive Plaintiff's salary payments.  Thus, Plaintiff's salary could not be a "wage" under the Statute because such wages must be for Plaintiff's own time, effort, or product.  Under the Employment Agreement, if Plaintiff does not work at all, he (or his descendants) are still entitled to his salary.  Therefore, such payments are not wages for purposes of the Wage Payment Statute.

The court finds unpersuasive Plaintiff's argument that because Defendant filed a W-2 for Plaintiff's salary and withheld taxes, Plaintiff's salary is a "wage" under the Statute.  The inquiry of whether payments to an employee constitute a "wage" under the Wage Payment Statute is inapposite to whether such payments constitute taxable income for the U.S. Internal Revenue Service.

For the reasons set forth in this section, Defendant's motion for summary judgment on Plaintiff's claim for penalties under the Wage Payment Statute is **GRANTED**.  Plaintiff's claim for penalties from his unpaid commission is barred by the applicable statute of limitation, and Plaintiff's salary under the Employment Agreement does not constitute a "wage" under the Wage Payment Statute.

### C.    Defendant's Counterclaim

Plaintiff moves for summary judgment on Defendant's counterclaim for reimbursement in the amount of $8,827.87 related to Plaintiff's automobile lease. Plaintiff argues that summary judgment is proper because Defendant is not entitled to reimbursement from Plaintiff for money Defendant paid to a third party.  However, in support of his motion, Plaintiff submits no evidence to enable the court to discern the

22

facts surrounding Defendant's counterclaim.  Aside from the bare assertions in his brief, there is no evidence of who actually received Defendant's payments for Plaintiff's automobile lease, how much those payments were, when they stopped, etc.  Although Plaintiff argues, as a matter of law, that Defendant cannot seek reimbursement from Plaintiff because Defendant paid the disputed funds to a third party, Plaintiff submits no evidence to show that Defendant, in fact, paid a third party.  Without any evidence supporting his motion, summary judgment for Plaintiff on Defendant's counterclaim is improper.

## IV.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment (Docket # 35) is **GRANTED** in part and **DENIED** in part.  Defendant's motion is granted with respect to Plaintiff's claims under Indiana's Wage Payment Statute but denied with respect to Plaintiff's breach of contract claims.  Plaintiff's cross-motion for summary judgment (Docket # 37) is **DENIED** in its entirety.

**SO ORDERED** this 28th day of March 2008.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic copies to:

Adam D. Christensen
LEWIS & KAPPES
achristensen@lewis-kappes.com

David W. Gray
LEWIS & KAPPES
dgray@lewis-kappes.com

Gordon  Locke
lockelaw@cyburban.com

Shane C. Mulholland
BURT, BLEE, DIXON, SUTTON & BLOOM
mulholland@burtblee.com